UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ERICA KING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-CV-0521-B |
| | § | |
| FIRSTSERVICE RESIDENTIAL | § | |
| TEXAS, INC., d/b/a FIRSTSERVICE | § | |
| RESIDENTIAL, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant FirstService Residential Texas, Inc., d/b/a FirstService

Residential ("FSR")'s Motion for Summary Judgment (Doc. 30). For the reasons explained below,

the Court **GRANTS** FSR's Motion for Summary Judgment in its entirety.

## I.

## BACKGROUND

In 2021 Plaintiff Erica King, a Black woman, purchased a condominium unit at the Athena

Condominiums (the "Athena") in Dallas, Texas. *See* Doc. 31, Mot. Summ. J. Br., 7. The Athena is

governed by the Athena Condominium Co-Owner's Association (the "Association"). *Id.* As a condo

owner, King is an Association member and is subject to the Association's rules, bylaws, and

restrictions. *Id.* The Association's Board of Directors, made up of elected co-owners, enforces the

Association's rules and regulations. *Id.*

From the time King purchased her unit until April 2022, Intercity Investments, Inc. ("ICI")

served as the property management company for the Athena. *Id.* In 2022, the Association hired FSR

to serve as the Athena's new property management company. *Id.* Some prior ICI employees transitioned into employment with FSR in order to continue their work at the Athena, including Mathew Keller (the general manager) and Elsa Lira (the Assistant Manager). *Id.* at 8.

King bases her various claims in this lawsuit on the same four alleged occurrences. First, she testified that after FSR became the Association's property management company, she emailed a renovation proposal to the Association's board members and certain FSR employees, including Keller and Lira. *See* Doc. 32, Def.'s App., Ex. 6, King Dep., 89:3–90:4 (hereinafter "King Dep."). King sent the renovation proposals to Keller and Lira because they had told her that they were responsible for determining whether renovation proposals satisfied the Association's bylaws before forwarding renovation proposals to the Association's architectural review committee. *See id.* at 89:7-13. The Association's bylaws required contractors performing renovations to have worker's compensation insurance. Doc. 31, Mot. Summ. J. Br., 7-8. King's proffered contractor did not have worker's compensation insurance. King Dep., 33:8-9. Keller and Lira did not send King's proposal to the architectural review committee, even though, according to King's testimony, they had previously passed along renovation proposals that did not utilize contractors with worker's compensation insurance to the architectural review committee. *Id.* at 33:3-9. King argues FSR treated her differently due to her race. *Id.* at 87:18–88:2. In support of her belief, she testified that she spoke to many DFW contractors who told her they had worked at the Athena without worker's compensation insurance in the past. *Id.* at 87:22-24. She also claimed to have "over 2,000 pages of objective evidence" to support her contention. *Id.* at 91:14. However, King has not attached the purported documentary evidence to her summary judgment response. King only attached her state court petitions, the final judgment from the state court, and the Management Agreement and

Staffing Services Addendum between FSR and the Association (the "Management Agreement"). *See* Doc. 34-1, Pl.'s App., 1.

Second, King testified that Keller harassed her. According to King, Keller acted "annoyed" or "abrasive" with her and was not "kind in his tone and the volume of his voice and the choice of his wording." King Dep., 92:16-20. In contrast, when she saw Keller talking to "white visitors of other Athena co-owners" and John, her partner who was also White, he acted kind and approachable. *Id.* at 93:1-9.

Third, King testified that she submitted "multiple grievances to [an FSR executive]" and another FSR employee but did not receive a response. *Id.* at 17:19-22.

Fourth, King described two instances where she believed FSR entered her unit without authorization. The first instance was in February 2023 when, according to King's testimony, someone attempted to enter her unit while she was sleeping but was prevented from doing so due to her chain lock. King Dep., 38:12-14. The second instance was in March 2023 when, according to King's testimony, an exterminator entered her unit without her authorization while she was not there. *Id.* at 38:19-20, 39:11-17. King also testified that it was FSR's policy for an FSR employee to enter the unit with an exterminator. *Id.* at 39:18-21. Although she did not personally witness the two asserted entries, King says she has "a huge archive of what [she] believe[s] to be objective evidence" that an FSR employee entered her unit. *Id.* at 40:5-6.

King originally sued the Association and ICI in state court. In June 2023, King filed her third amended petition in state court, alleging breach of contract, violation of the Texas Fair Housing Act, and causes of action under 42 U.S.C. §§ 1981, 1982, 3604, and 3617. *See* Doc. 34-1, Def.'s App., Ex. 2, Third Am. Pet., 46-55. In 2025, after conducting a jury trial, the state court judge

sanctioned King by entering a final order dismissing her claims with prejudice because the court found she had tampered with witnesses, destroyed evidence, and was willfully dishonest with the court and counsel. *Id.*, Ex. 3, Final J., 1-2.

In November 2024, King sold her condominium at the Athena. King Dep., 11:25–12:2.

In February 2025, King filed this federal lawsuit against FSR for (1) claims under the same four federal statutes under which she sued the Association and ICI, (2) invasion of privacy, (3) intentional infliction of emotional distress ("IIED"), (4) negligent hiring, supervision, and retention, and (5) civil conspiracy. *See* Doc. 1, Compl., 3-20.

FSR now moves for summary judgment on all of King's claims.

## II.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Stroy v. Gibson ex rel. Dep't of Veterans Affs.*, 896 F.3d 693, 697 (5th Cir. 2018). To determine whether a genuine dispute exists for trial, the court must view all evidence in the light most favorable to the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371-72 (5th Cir. 2002).

"[T]he movant does not need to negate the elements of claims on which the nonmoving parties would bear the burden of proof at trial." *Alvarado v. Briese Schiffahrts GmbH & Co. KG MS Sapphire*, 161 F.4th 289, 294 (5th Cir. 2025) (quoting *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996)). Instead, "[t]he movant's burden is only [to] point out the absence of evidence supporting the nonmoving party's case." *Id.* (citation omitted). "If the movant meets that

burden, 'the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial,' by 'identify[ing] specific evidence in the record, and articulat[ing] the "precise manner" in which that evidence support[s] [his] claim[s].'" *Id.* (citation omitted). A non-movant who has the burden of proof at trial will not be saved from adverse summary judgment by "conclusory allegations," "unsubstantiated assertions," or a mere "'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).

Finally, the evidence that any party proffers "must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citation omitted).

## III.

## ANALYSIS

Summary judgment on King's claims is appropriate because she has not produced more than a scintilla of evidence to support her claims. In the first subsection, the Court addresses FSR's evidentiary objections to King's summary judgment evidence. In the second subsection, the Court addresses King's two federal claims. In the third subsection, the Court determines that maintaining supplemental jurisdiction over King's state law claims is appropriate and evaluates those claims on the merits.

A.    *Preliminary Evidentiary Issues.*

To streamline the analysis below, the Court begins with addressing FSR's evidentiary objections to King's summary judgment evidence. Particularly, King relies in part on inadmissible hearsay and speculation to support the following assertions: (1) that FSR applied its worker's compensation insurance requirement in a discriminatory manner, and (2) that FSR trespassed into her unit. The Court will the objections below.

First, to show FSR permitted White Athena owners to perform renovation work without complying with the same insurance requirement, King relies upon a series of excerpts from her own deposition testimony. *See* Doc. 34, Pl.'s Resp., 10-11. As relevant, those excerpts include:

> KING: Because I spoke to over ‑‑I think it was over 200 DFW contractors, and a lot of them told me or expressed that they probably don't want you there, they're probably trying to get you to sell, you probably need to get a lawyer. Then at least a couple of them recommended that I go to the City of Dallas and pull the building permits on The Athena to see who was renovating and repairing for the other Athena co-owners. And when I went to pull the permits, and I would call the contractors to see if they could take my job, they all told me that they didn't have workers' comp and never did have workers' comp. And when they did work for other Athena co-owners, they were approved, but they didn't have workers' comp. And that's when I discovered that I was being lied to.

King Dep., 87:13–88:2.

> KING: It turned ‑‑ it turned out to be over 2,000 pages of objective evidence to show that The Athena and their property management were allowing all of these other Athena co-owners to freely renovate and repair their condo units using all of these vendors and contractors who did not have workers' comp.

*Id.* at 91:13-18.

The excerpts are not admissible summary judgment evidence. First, although King testifies that she has "over 2,000 pages of objective evidence" showing that FSR excused the insurance requirement for other condo owners seeking to renovate, she attaches no such evidence to her summary judgment motion. Because this evidence is not on the record, the Court cannot evaluate its admissibility or otherwise consider it. King's testimony alone is insufficient to prove the content of the evidence. *See* Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.").

Second, King's testimony about what the contractors told her is inadmissible hearsay. Hearsay is an out-of-court statement offered for the truth of the matter asserted. It is "not competent summary judgment evidence," unless an exception applies. *Miller v. Michaels Stores, Inc.*, 98 F.4th

211, 218 (5th Cir. 2024) (citations omitted). King's testimony regarding what the contractors told her—that they worked at the Athena without worker's compensation insurance—contains hearsay because it relies upon the contractors' out-of-court statements to show that other contractors did not have to abide by the worker's compensation requirement. King offers no argument why an exception to the hearsay rule applies. The Court therefore disregards the purported content of the contractors' statements as inadmissible hearsay.

Third, King's trespass assertion is based on speculation. In support of her trespass claim, she cites to the following testimony:

> KING: There were unauthorized entries into my condo for non-emergent purposes, which went against my established . . . entry directives. This happened in -- where I was aware, at least, this happened in 2023. There was an attempt into my property when I was sleeping, but the chain lock was on, so they couldn't get in, and that was for a non-emergent entry. Myself and my attorneys at the time both sent emails to The Athena and also FirstService Residential to ask them to not do that, because it went against my entry directives. And less than a month later, they did it again, and they went in when I was not there for a non-emergent purpose, and I believe that was harassing, and I believe it was illegal on the part of FirstService Residential Matthew Keller, and FirstService Residential Elsa Lira, the managers at The Athena, because they were told.

King Dep., 38:8-24.

> QUESTION: Okay. And there -- you also, to be fair, say also again, on -- on another entry on March 16th, 2023, you alleged that in your current federal petition. Do you see that?
>
> KING: Yes.
>
> QUESTION: Okay. And . . . that's the incident where The Athena vendor, [Jonmar] Extermination, entered your property?
>
> KING: The Athena vendor and an employee with FirstService Residential, because there's always a FirstService Residential employee that goes in with them. I don't know who the employee was, though.
>
> QUESTION: How do you know there was someone on behalf of FirstService there?

KING: Because they are always with extermination, and that's the policy.

QUESTION: Do you know -- as you sit here today, do you have any definitive proof that anyone other than the vendor on behalf of [Jonmar] Extermination -- on behalf of The Athena entered your property that day?

KING: I believe I can find it. . . . I have a lot of -- a huge archive of what I believe to be objective evidence. I would have to go and sift through it.

King Dep., 39:6–40:7.

King testified that an FSR employee entered or authorized entry into her unit and asserted that a "huge archive" of proof exists. King did not personally witness these entries because she was asleep during the first alleged instance, and she was not home during the second alleged instance. What King can tell us about the "huge archive" of proof is insufficient to raise a fact issue as the evidence is not before the court.

Trimming away the inadmissible evidence, King has offered no competent evidence to support a reasonable inference of physical intrusion into her condo by FSR. Starting with the February incident, King provides no evidence to support that it was an FSR employee that attempted to enter her unit. While it is possible the person attempting to open her locked door was an FSR employee, it is just as reasonable to conclude that it was someone completely unrelated to FSR that attempted to open the door. Besides that, in the February incident, the person was unable to physically intrude because of the chain lock on King's door. Without evidence to indicate an actual intrusion by FSR, King's testimony constitutes mere conjecture.

Next, as King concedes in her summary judgment response, there is no evidence in the record identifying an FSR employee involved in the alleged March 2023 event. *See* Doc. 34, Pl.'s Resp., 11. Moreover, her assertion that the "evidence permits an inference that management

authorized, facilitated, or allowed the entry," *id.*, finds no basis in the evidence she cites. Besides the testimony excerpted above, King points to sections 3.01 and 2.03 of the Management Agreement. *See id.* But the Management Agreement does not contain sections numbered 3.01 or 2.03. *See* Doc. 34-1, Ex. 4, Mgmt. Agreement, 2, 7-8. Accordingly, King's contention that such a policy exists is unsupported by evidence and insufficient to permit an inference that an exterminator's entry into her unit implicates FSR.

Thus, to the extent King attempts to rely upon inadmissible summary judgment evidence to support her claims below, the Court properly disregards it when making the following determinations.

B.    *The Court Grants Summary Judgment to FSR on King's §§ 1981 and 1982 Claims Because She Cannot Support a Prima Facie Case of Racial Discrimination.*

King's §§ 1981 and 1982 claims fail because once the inadmissible portions of this testimony are trimmed away, a review of the remaining evidence does not save King from adverse summary judgment. Viewing the admissible evidence in the light most favorable to King, no reasonable juror could conclude that FSR intentionally discriminated against King in the ways prohibited by §§ 1981 and 1982.

Section 1981 "guarantees to '[a]ll persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens.'" *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399 (5th Cir. 2021) (quoting § 1981(a)). "Section 1982 ensures that all citizens have the 'same right . . . to inherit, purchase, lease, sell, hold, and convey real and personal property.'" *Jackson v. Siegel Grp. LLC*, No. 1:20-cv-355-HSO-RHWR, 2022 WL 1056149, at *7 (S.D. Miss. Feb. 25, 2022) (quoting § 1982). Importantly, the statutes do not support a general claim for race discrimination. *Perry v. VHS S.A. Partners, LLC*, 990 F.3d 918, 931 (5th Cir. 2021) (citation

omitted). Instead, they bar discrimination only in contracting and in exercising property rights. *See id.*

Accordingly, King is left only with her testimony regarding Keller's unpleasant attitude, which does not show discrimination concerning contract or property rights protected by §§ 1981 and 1982. King cites to the following testimony to demonstrate Keller's attitude towards her:

> KING: I have never had what I could -- would describe personally as a pleasant or even neutral interaction with Matthew Keller. I would personally describe those interactions as him being abrasive, him seemingly annoyed or not wanting to interact with me, almost as if repellent of me, him not being kind in his tone and the volume of his voice and the choice of his wording. I would describe those interactions, given what I know now and what has happened, as being discriminatory and harassing. . . . When I would see him interact with the white visitors of other Athena co-owners, and I would see him react even with John, who is white, I felt that those interactions were night and day compared to what my experience or treatment was concerning Matthew Keller. He was very pleasant. He was very kind. The way that he articulated his words or emphasized his words were very -- very nice, very friendly, very approachable. And I did not --I don't feel that I ever got the same treatment from Matthew Keller.

*Id.* at 92:12-22, 93:11.

To be sure, evidence of a "night and day" difference in how someone interacts with a Black person as compared to a White person is circumstantial evidence from which a factfinder could infer different treatment based on race. But §§ 1981 and 1982 do not provide "general cause[s] of action for race discrimination." *See id.* Instead, the discrimination at issue must concern the contract or property rights specified by the relevant statute. *See id.*

Without evidence showing discrimination relating to the sale, rental, or purchase of the property, King cannot support an essential fact necessary for her § 1982 claim. *See Cantu v. Nocona Hills Owners Ass'n*, No. CA 7:00-CV-220-R, 2002 WL 67974, at *4 (N.D. Tex. Jan. 11, 2002) ("Plaintiff's claims cannot survive summary judgment because Section 1982 applies to the denial of

housing because of one's race, as opposed to discrimination in the conditions of housing." (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413-14 (1968))); *Bradley v. Raytheon Co.*, No. 03:08-CV-0869-O, 2010 WL 110275, at *6 (N.D. Tex. Jan. 6, 2010) (O'Connor, J.) ("[T]o the extent that the complaint purports to raise any § 1982 claims, summary judgment should be granted, as [the plaintiff] has failed to allege an interest protected by the statutory language of that section."). King does not bring forth any evidence showing she experienced any discrimination concerning the purchase, rental, or sale of her property. King does not provide evidence or argue, for example, that FSR's discrimination against her impeded the sale of her unit.

Turning to King's § 1981 claim, King does not provide more than a scintilla of evidence to suggest FSR racially discriminated against her in a way affecting her right to contract. Although King does not specifically identify an impaired contractual relationship in her response, she appears to be arguing that FSR prevented her from contracting with her chosen renovation contractor by applying the Association's bylaws to her, but not to other Athena owners. *See* Doc. 34, Pl.'s Resp., 10. But, as discussed above, King has offered no evidence to support her belief that the insurance requirements were not applied to other condo owners. Instead, she points to the following deposition testimony:

> KING: But I was told by Matthew Keller numerous times that he and the assistant manager were responsible for ensuring that all of the requirements and the insurances were met according to the bylaws before they would ever propose or give over my proposal packet to the Athena architectural review committee for approval or disapproval.

*Id.* at 89:7-13. But there is no evidence in the record indicating Keller forwarded non-complying proposals to the architectural review committee. Without explaining the basis for that assertion, the inference is unsupported by the evidence.

Accordingly, as King has not carried her initial burden of supporting a prima facie case of race discrimination, summary judgment to FSR on the §§ 1981 and 1982 claims is appropriate.

C.    *The Court Grants Summary Judgment to FSR on King's Fair Housing Act Claims Because Her Complaints Exceed the Scope of §§ 3604(b) and 3617.*

King argues that her FHA claims should survive summary judgment because she has brought forth evidence showing FSR interfered with her "housing-related services and enjoyment of her dwelling." Doc. 34, Pl.'s Resp., 9. In support of her FHA claim, King points to her testimony concerning the alleged entries into her unit, Keller's attitude towards her, and the insurance requirement for proposed contractors. *See* Doc. 34, Pl.'s Resp., 9. As discussed above, she does not present competent summary judgment evidence to support her assertions that FSR trespassed into her unit or that the insurance requirement was applied discriminatorily.

The FHA was enacted to prevent racial discrimination in the sale or purchase of housing. *See* 42 U.S.C. § 3604(a). Section 3604(b) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race[.]" Section 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person" who is or was exercising rights under the FHA or aiding someone else to enjoy their FHA rights. The Court starts with the § 3604(b) claim and then address the § 3617 claim.

First, for the § 3604(b) claim, in *Cox v. City of Dallas*, the Fifth Circuit explained that a plaintiff arguing discrimination in the provision of housing services must still show a "connection between the alleged discrimination and the sale or rental of a dwelling[.]" 430 F.3d 734, 746 (5th Cir. 2005). That is because "the phrase 'in connection therewith' refers to the sale or rental of a dwelling rather than to the dwelling itself." *AHF Cmty. Dev., LLC v. City of Dallas*, 633 F. Supp. 2d 287, 301-02 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Cox*, 430 F.3d at 745). Accordingly, the services

being provided in a discriminatory manner must also implicate the "availability and acquisition, rather than . . . the habitability and enjoyment" of the housing. *Id.* at 30.

A broad category of services can fall within § 3604(b)'s orbit as long as they impact the availability of a dwelling. The Fifth Circuit has noted that offering or failing to offer applications to prospective residents is connected to the rental or sale of a dwelling. *See Cox*, 430 F.3d at 746 n.37. Other services, such as maintenance, can also be connected to the rental or sale of a dwelling when the failure to provide such services in a timely manner, or at all, is aimed at constructively evicting a tenant. *See id.*

King has not identified services that implicate the availability of her condo—as required to establish a § 3604(b) claim. Although Keller's attitude towards King could affect her enjoyment of living at the Athena, she does not cite evidence connecting Keller's rude behavior with her basic ability to occupy the condo. Nor does she show that Keller's attitude led to a constructive eviction. King does cite to evidence that shows that Keller ignored maintenance requests or prevented her from utilizing amenities to which she was entitled, conduct that could support a § 3604(b) claim. *See Woods-Drake v. Lundy*, 667 F.2d 1198, 1201-02 (5th Cir. 1982) (finding a § 3604(b) violation when the landlord implemented a White-visitors-only condition onto a lease). Accordingly, FSR is entitled to summary judgment on King's § 3604(b) claim.

Second, claims under § 3617 are for retaliation based on an exercise of an FHA-protected right. Under the statute, a plaintiff must show the defendant coerced, threatened, intimidated, or interfered with her due to her exercise of a FHA right. *See* § 3617. Intimidation, harassment, or interference with FHA rights is a high bar. *See Reule v. Sherwood Valley I Council of Co-Owners, Inc.*, No. CIV.A. H-05-3197, 2005 WL 2669480, at *4 (S.D. Tex. Oct. 19, 2005) (explaining that HOA's

preferential treatment to other condo owners and unfavorable treatment towards plaintiff did not rise to a § 3617 claim, as contrasted with successful § 3617 claims where president of HOA applied chemicals to a tenant's yard or where management company told a tenant he would not be reimbursed for water damage to teach him a lesson).

Here, Keller's rude attitude does not reach the severity necessary to support a § 3617 claim. Even assuming Keller's rudeness was a targeted response to King exercising her FHA rights, it does not meet the level of intimidation, harassment, or interference necessary to trigger § 3617's protection. *See id.* ("Plaintiff alleges conduct, such as favorable treatment for other residents, unfriendly treatment of Plaintiff, her child, and her dogs . . . is significantly less egregious than conduct which states a claim under § 3617."). Summary judgment on her § 3617 claim is therefore appropriate.

D.      *Summary Judgment on King's Texas Law Claims is Appropriate.*

The Court begins by deciding whether it should exercise jurisdiction over the remaining state law claims when all of King's federal law claims have been disposed of prior to trial. Finding that the provisions laid out in 28 U.S.C. § 1367(c) and considerations of judicial economy, convenience, and fairness favor maintaining supplemental jurisdiction over the state law claims, the Court addresses each of King's state law claims in turn.

1.      Section § 1367(c) And Other Relevant Considerations Support The Court's Decision To Maintain Supplemental Jurisdiction Over The State Law Claims.

"[A] district court has discretionary power to adjudicate pendent [state] claims after it has dismissed the federal claims that originally invoked its jurisdiction." *Cinel v. Connick*, 15 F.3d 1338, 1344 (5th Cir. 1994) (citations omitted). "To make this determination, the district court should consider the statutory provisions of 28 U.S.C. § 1367(c) and the relevant factors of judicial economy,

convenience, fairness, and comity." *Brim v. ExxonMobil Pipeline Co.*, 213 F. App'x 303, 305 (5th Cir. 2007) (citing *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)). A court may decline to exercise supplemental jurisdiction over remaining state law claims when:

> (1) a claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

§ 1367(c).

The Fifth Circuit has found a district court abused its discretion by declining to address state law claims when the remaining state law claims were not novel or complex, the case had been pending in federal court for almost three years, and trial was scheduled to begin a month later. *See Batiste v. Island Recs. Inc.*, 179 F.3d 217, 227-28 (5th Cir. 1999); *see also Mendoza v. Murphy*, 532 F.3d 342, 346-47 (5th Cir. 2008) (noting that trial court did not abuse discretion in keeping jurisdiction over plaintiff's state law claims because the state law issues were not complex or novel, the case had been pending for more than a year, the discovery deadline had passed, there was a ripe summary judgment motion pending, and adjudicating the state law claims would promote conserving judicial resources); *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 456 (5th Cir. 1996) (concluding that district court did not abuse discretion in exercising jurisdiction over state law claims when plaintiff did not raise novel state law claims, the lawsuit had been pending for more than two years, the trial date was less than a month away, the record contained hundreds of pleadings, extensive discovery disclosures had been prepared, and multiple summary judgment motions were pending).

Here, the Court finds that § 1367(c) and the factors of convenience, fairness, and judicial economy strongly favor maintaining supplemental jurisdiction over King's state law claims. First, in

reviewing the § 1367(c) provisions, only the third factor—the fact that the federal claims have been dismissed—weighs against addressing the state law claims. In contrast, the first two factors—the state law claims' non-complexity and non-dominance over the federal claims—weigh in favor of retaining supplemental jurisdiction. King's state law claims are not novel or complex: invasion of privacy, negligence, IIED, and civil conspiracy are all common law claims that courts in this district deal with regularly. Moreover, the Texas law claims do not predominate over the federal claims because King relies upon the same facts and allegations to support all of her claims. Additionally, only King's invasion of privacy claim stands alone as an independent tort, as discussed below.

Second, the Court concludes that the relevant considerations of judicial economy, fairness, and convenience favor retaining jurisdiction over the state law claims. This case has been pending in federal court for over a year. The parties have completed discovery and fully briefed the summary judgment motion addressing all claims, federal and state. The trial date is less than a month away. It would be inconvenient to the parties and a waste of judicial resources to send the state law claims to state court for adjudication. Moreover, as King relies upon the same circumstances to support both her federal claims and state law claims, the Court is already familiar with the facts underpinning her state law claims. *Batiste*, 179 F.3d at 228 ("The familiarity of the district court with the merits of the [plaintiff's] claims demonstrates that further proceedings in the district court would prevent redundancy and conserve scarce judicial resources[.]").

Therefore, after reviewing the statutory provisions and the other relevant considerations, the Court finds it appropriate to retain supplemental jurisdiction over King's state law claims and accordingly will address each claim in turn below.

2.    King Has Not Shown FSR Trespassed Into Her Unit, Which Is Necessary For Her Invasion Of Privacy Claim.

"Invasion of privacy is [a] widely recognized . . . common law tort." *Perrill v. Equifax Info. Servs., LLC*, 205 F. Supp. 3d 869, 873 (W.D. Tex. 2016) (citations omitted). "Texas recognizes three separate types of invasion of privacy: (1) intrusion upon seclusion or solitude or into one's private affairs; (2) public disclosure of embarrassing private facts; and (3) wrongful appropriation of one's name or likeness." *Doggett v. Travis Law Firm, P.C.*, 555 S.W.3d 127, 130 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *Cain v. Hearst Corp.*, 878 S.W.2d 577, 578 (Tex. 1994)). Here, King brings a claim for intrusion upon seclusion. *See* Doc. 1, Compl., 10-13.

For an intrusion upon seclusion claim, a plaintiff must show "(1) an intentional intrusion, physically or otherwise, upon another's solitude, seclusion, or private affairs or concerns; (2) which would be highly offensive to a reasonable person; and (3) that caused injury." *Rogers v. City of Houston*, 627 S.W.3d 777, 792 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (other citation omitted) (citing *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993)). "In evaluating the 'highly offensive' element, courts have required that the intrusion be unreasonable, unjustified, or unwarranted." *Id.* (citation omitted). "The intrusion tort typically involves some sort of *physical* invasion of a person's property and is thus conceptually a quasi-trespass tort." *Doe v. United States*, 83 F. Supp. 2d 833, 840 (S.D. Tex. 2000) (emphasis in original).

FSR argues King cannot raise a fact issue on her intrusion upon seclusion claim because she has no evidence that any FSR employee actually trespassed into her unit. *See* Doc. 31, Mot. Summ. J. Br., 21. As discussed earlier in Part III Section A, the Court agrees with FSR that King has not presented competent summary judgment evidence showing FSR trespassed into her unit. Summary judgment on her intrusion upon seclusion claim is therefore appropriate.

3.    King's IIED Claim Is Preempted And No Reasonable Fact Finder Could Conclude That The Conduct Of Which She Complains Was Extreme Or Outrageous.

IIED is a "a 'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). Accordingly, "a plaintiff may not bring an IIED claim when other statutory remedies are available for the underlying conduct." *Jones v. Dallas Cnty.*, No. 3:11-CV-2153-D, 2013 WL 6388441, at *7 (N.D. Tex. Dec. 6, 2013) (Fitzwater, C.J.) (citation omitted). "Even if other remedies do not explicitly preempt the tort, their availability leaves no gap to fill." *Id.*

An IIED claim under Texas law requires evidence showing (1) the defendant "acted intentionally or recklessly"; (2) its "conduct was extreme and outrageous"; (3) its "actions caused [plaintiff] emotional distress"; and (4) "the emotional distress was severe." *Kroger Texas Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006). The Texas Court of Appeals identified what a plaintiff must show to raise a fact issue on the extreme or outrageous element in the *Bill Wyly* case:

> To meet the second element, a defendant's conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous. Recovery for intentional infliction of emotional distress must typically be based on circumstances that border on serious criminal acts. Generally, insensitive or rude behavior does not constitute extreme or outrageous conduct. Likewise, liability does not arise from mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Bill Wyly Dev., Inc. v. Smith*, 680 S.W.3d 679, 684-85 (Tex. App.—Houston [14th Dist.] 2023, no pet.) (internal citations and quotation marks omitted).

FSR argues that King cannot raise a fact issue on the second element of her IIED claim because the conduct of which she complains is not the type of behavior that could be so "extreme and outrageous" to be considered "atrocious." Doc. 31, Mot. Summ. J. Br., 23. Moreover, FSR argues that, because IIED is a gap-filler tort and King's other causes of action are based on the same facts, she does not need an IIED claim in order to obtain relief. *Id.* at 22.

The Court agrees with FSR. First, because King relies upon the same alleged occurrences for her IIED claim as her non-IIED claims, her IIED claim is preempted. The same alleged disparate treatment based on race, unconsented entries into her unit, and harassment from FSR employees underpin all of her claims. *See* Doc. 34, Pl.'s Resp., 12; s*ee Phillips v. United Parcel Serv.*, No. 3:10-CV-1197-G-BH, 2011 WL 2680725, at *14 (N.D. Tex. June 21, 2011) (Ramirez, Mag. J.) ("Since Plaintiff relies on the same alleged conduct as part of her discrimination, harassment, and retaliation claims, her claim of [IIED] is preempted."), *report and recommendation adopted*, 2011 WL 2678949 (N.D. Tex. July 8, 2011) (Fish, S.J.). Accordingly, King's IIED claim is preempted, and FSR is entitled to judgment as a matter of law.

Second, even if her claim was not preempted, no reasonable juror could conclude the conduct she describes "go[es] beyond all possible bounds of decency" to raise a fact issue on the second element of her IIED claim. *See Bill Wyly*, 680 S.W.3d at 684. In an attempt to raise a fact issue on her IIED claim, King "relies on her testimony regarding the February and March 2023 entry events, her testimony concerning how Keller treated her, her testimony about grievance escalation, and the factual allegations in the Third Amended Petition regarding continued differential treatment and renovation-related interference[.]" Doc. 34, Pl.'s Resp., 12. For the reasons discussed

in Part III Section A, only her "testimony concerning how Keller treated her" and the "grievance escalation" can support her IIED claim *See id.*

King testified that Keller was "abrasive" or "annoyed" in her presence. This behavior might be rude, but it is within the realm of typical human interaction, not the borderline criminal conduct that could support the extreme and outrageous element. For the "grievance escalation," King provides no details on what her grievances were about or in what circumstances she submitted them to FSR. Without more specifics, no reasonable juror could find that FSR's lack of response, on its own, constituted extreme or outrageous behavior. Accordingly, even if King's IIED claim were not preempted, summary judgment would still be appropriate because she has failed to point to facts that could support the extreme and outrageous element of her claim.

4.     King Fails To Show That FSR Committed An Underlying Tort Or That FSR Breached A Duty To Supervise Its Employees As Required To Support Her Negligence Claims.

"Negligent hiring, training, supervision, and retention claims are 'simple negligence causes of action based on an employer's direct negligence rather than on vicarious liability.'" *Black v. Smith Protective Servs., Inc.*, No. 01-14-00969-CV, 2016 WL 5400565, at *3 (Tex. App.—Houston [1st Dist.] Sept. 23, 2016, no pet.) (quoting *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App.–Fort Worth 2008, no pet.)). "The elements of a negligence action are duty, a breach of that duty, and damages proximately caused by the breach." *Dangerfield*, 264 S.W.3d at 912. "[A]n employer is liable for negligent hiring, retention, or supervision if it hires an incompetent or unfit employee whom it knows, or by the exercise of reasonable care should have known, was incompetent or unfit, thereby creating an unreasonable risk of harm to others." *Id.* (citation omitted). Lastly, "Texas courts have held that plaintiffs bringing a negligent supervision claim must 'establish not only that the employer was negligent in hiring or supervising the employee, but also that the employee committed an

actionable tort against the plaintiff.'" *Amin v. United Parcel Serv., Inc.*, 66 F.4th 568, 576 (5th Cir. 2023) (quoting *Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 384 (Tex. App.–Houston [1st Dist.] 2005)).

Here, FSR argues that King's negligence claims fail as a matter of law because she cannot prove an FSR employee committed an underlying tort, as required by Texas law. Doc. 31, Mot. Summ. J. Br., 23-24. Furthermore, it argues King has failed to show that FSR owed her a duty to supervise its employees or that any breach of such duty harmed her. *Id.* at 25.

In response, King argues that her negligent supervision claim survives summary judgment because she "testified that she submitted grievances to FSR executives but that nothing was done in response" and the Management Agreement "assigned training and oversight responsibilities to FSR." Doc. 34, Pl.'s Resp., 12-13.

The Court agrees with FSR that King's negligence claims fail because she has not shown that FSR employees committed an underlying tortious act. The Court has already granted summary judgment on King's claims involving the FSR employee's alleged actions. Accordingly, she is left without an underlying tort to rely upon for her negligence claims. Summary judgment is therefore appropriate on that basis alone.

Moreover, King's negligence claims fail because she has brought forward no evidence indicating FSR could have foreseen that its employees were likely to harm King without its intervention. Her vague assertion that she submitted "grievances" to FSR executives, without providing any details of what those grievances entailed, is insufficient to show that FSR knew or should have known of its employees' alleged "incompetence." Without more evidence, no reasonable juror could infer that FSR was breaching a duty to King. Accordingly, as King has not

raised a fact issue on an essential element of her negligence claims, summary judgment to FSR is proper.

5.    Without An Underlying Tort, King's Civil Conspiracy Claim Cannot Survive Summary Judgment.

"Civil conspiracy is a derivative tort; therefore, liability for a civil conspiracy depends on participation in an underlying tort." *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402 (5th Cir. 2013) (citation omitted). "In order to adequately plead a claim for civil conspiracy, a plaintiff must adequately plead the underlying tort." *Id.* (citations omitted). "If a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) (citation omitted).

Accordingly, as King has no remaining claims, her civil conspiracy claim fails as a matter of law.

IV.

CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant FSR's Motion for Summary Judgment (Doc. 30). A final judgment will follow. As no claims remain, all remaining pretrial deadlines, including the trial date, are hereby **VACATED**.

SO ORDERED.

SIGNED: April 30, 2026.

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE